UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MARYANN LEVESQUE,** | : | |
| **Plaintiff** | : | |
| | : | **No. 3:01 CV 1325 (DJS)** |
| **V.** | : | |
| | : | |
| **TOWN OF VERNON, LAURENCE R.** | : | |
| **SCHAFFER, JOHN VAN OUDENHOVE** | : | |
| **and DANIEL SULLIVAN,** | : | **April 15, 2004** |
| **Defendants.** | : | |
| | : | |

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

I.    INTRODUCTION

Plaintiff, Maryann Levesque initiated this action by filing a complaint on or about July 13, 2001.  Defendants now move this Court to enter summary judgment in their favor on each count alleged in Plaintiff's Complaint.  Defendants have not, however, met their burden of proving the absence of any genuine issue of material fact entitling them to judgment as a matter of law on any of Plaintiff's claims.  Accordingly, Defendants' Motion for Summary Judgment should be denied in its entirety.

II.    FACTUAL BACKGROUND

The instant action arises out of Defendants' retaliatory decision to terminate Plaintiff's employment and the unlawful manner in which its decision was executed.  Defendant Town of Vernon ("Town"), hired Plaintiff on July 20, 1995 to work in the office of the Town Assessor. (Letter of Hire, attached hereto as Ex. A.)  She worked in the office of the Town Assessor uninterrupted from that time until she was terminated on March 12, 2001.  (Levesque Aff. ¶ 2,

attached hereto as Ex. B.)  While employed as an assessment technician, Plaintiff completed

assessment certification training and education courses that enhanced her job knowledge and

skills.  (Compl. ¶ 13; Levesque Aff. ¶ 4; Sullivan Depo at 17, attached hereto as Ex. D.)

     In 1996, Plaintiff accepted a permanent full-time position in the Assessor's Office as an

Assessment Technician.  (Levesque Aff. at ¶ 2; Promotion Letter, attached hereto as Ex. C.)  In

that capacity, Plaintiff was a classified civil service employee who could only be terminated for

cause, reduction in force due to necessary economics, or because of abolition or consolidation of

positions by reorganization.  (Charter at 43-44, attached hereto as Ex. E.)

     Plaintiff was a diligent, detail-oriented employee who often discovered mistakes being

made in the Assessor's office.  In fact, even after her termination, Mr. Shaffer, the Town

Administrator who terminated her, stated that "there was never any question about [Plaintiff's]

knowledge [of her job] or work ethic."  (Shaffer Depo. at 65, attached hereto as Ex. F.)  Some of

the mistakes Plaintiff caught were committed by her supervisor, Defendant Jack Van

Oudenhove, the Town Assessor.  (*See* Plaintiff's Response to Defendants' Interrogatory No. 3,

attached hereto as Ex. G.)  For example, in 1996, Plaintiff participated in an audit program that

identified over one million dollars in additional taxable property for the Town that had "slipped

through the cracks."  (Compl. ¶ 13; Newspaper Article, attached hereto as Ex. H.)  Others

involved failures to correct tax bills to reflect a taxpayer's veteran status and failing to perform

field work to discover approximately $100,000 of taxable property that would have cost the

Town $18,000 in lost revenue over three years. (Plaintiff's Response to Interrogatory No. 3,

annexed hereto as Exhibit G).

     The Town was aware of the mistakes being made in the Assessor's Office.  In response to

those mistakes, the Town Administrator, Mr. Shaffer, monitored the performance of the Town

Assessor, Mr. Van Oudenhove. (Sullivan Depo. at 29, 63.) Indeed, Mr. Shaffer indicated in his deposition that he "had been pounding on [Mr. Van Oudenhove] on performance issues for at least a year and a half." (Shaffer Depo. at 70-74.) For that reason, Mr. Van Oudenhove was denied a salary increase in the Spring of 2000 because of performance related reasons. (Shaffer Depo. at 58.)

Despite the well known problems in the Assessor's Office, the Town was aware that Mr. Van Oudenhove expressly instructed Plaintiff in writing not to check his work or report tax assessment problems to anyone outside the office. (Shaffer Depo. at 73-74.) Consistent with that instruction, Mr. Van Oudenhove disciplined Plaintiff for looking "for every little thread of information to use against the assessor and other staff members." Although Mr. Van Oudenhove never provided any specific evidence to support his claim, his motivation for that disciplinary statement was never questioned. (Shaffer Depo. at 80.)

The principal justification of Plaintiff's termination asserted by Defendants is a troubled working relationship between Plaintiff and Ms. Knipple, who began working in the Assessor's Office in or about the end of 1998. However, Plaintiff never had any trouble with any Town employees before Ms. Knipple began working in the Assessor's Office. Before Ms. Knipple began working in the Assessor's Office, there were no complaints in Plaintiff's personnel file. (Shaffer Depo. at 61; Sullivan Depo. at 23.) In fact, Peter Korbusieski, the Town Tax Collector whose work area shared space with the Assessor's office, characterized Plaintiff as a cooperative employee who got along very well with him and the employees in his office. (Korbusieski Depo. at 23, attached hereto as Ex. I.) He also indicated that Ms. Knipple, not Plaintiff, was responsible for the problems in the office, that Ms. Knipple had problems with other employees

in the office besides Plaintiff, and those problems persisted after Plaintiff was terminated.  (*See* Korbusieski Depo. at 26-29, 31, 40-42.)

Accordingly, Defendants admit that Ms. Knipple was at least partly responsible for the troubled relationship. Indeed, Mr. Shaffer felt Ms. Knipple's reactions to Plaintiff were "overblown histrionics". (Shaffer Depo. at 32, 53) Ms. Knipple, however, was never disciplined.

Moreover, the criticisms leveled against Plaintiff by Ms. Knipple and Mr. Van Oudenhove are utterly inconsistent.  For example, Ms. Knipple and Mr. Van Oudenhove simultaneously criticize Plaintiff for helping too much at the counter and for not helping enough. In April, 1999, Knipple complained when Plaintiff helped a customer who Ms. Knipple was already helping.  (Levesque Memo, dated April 5, 1999, attached hereto as Ex. J.)  In November, 1999, Ms. Knipple complained because Plaintiff "does not wait on customers.  She waits until I help them, and once I am at the counter and another customer comes up to the counter she still sits at her desk."  (Knipple Memo, dated Nov. 17, 1999, attached hereto as Ex. K.)  Then, in February of 2000, Mr. Van Oudenhove criticized Plaintiff for "not allowing [other employees] to answer telephones or answering at the counter."  (Van Oudenhove Memo, dated Feb. 8, 2000, attached hereto as Ex. L.)   These contradictory criticisms make manifest that Defendants' true motivation lie elsewhere.

As a result of Mr. Van Oudenhove's efforts, Plaintiff was denied a step increase in 2000. She later grieved that denial and complained that she was being treated unfairly.  (Shaffer Depo. at 65-67.)  In April, 2000, Plaintiff grieved a disciplinary memo placed in her personnel file by Mr. Van Oudenhove regarding Plaintiff's cooperation with office procedures.  (Levesque Grievance, dated April 19, 2000, attached hereto as Ex. M.)

After an investigation into the complaints made by Mr. Van Oudenhove, Mr. Ludecke, the Town Finance Director who oversaw both Van Oudenhove and Korbusieski, concluded that Plaintiff did not cause the problems cited by Mr. Van Oudenhove.  Instead, Mr. Ludecke concluded that the problems were caused by poor communication procedures in the Office of the Assessor.  (Grievance Resolution Memo, dated May 5, 2000, attached hereto as Ex. N.)  As the Town Assessor, Mr. Van Oudenhove, not Plaintiff, was responsible for those communication problems.  (Sullivan Depo. at 56-57.)  Nevertheless, the effort to oust Plaintiff persisted.

In that connection, Defendants acknowledge that Plaintiff and Ms. Knipple were treated differently.  Mr. Shaffer acknowledges that while both Plaintiff and Ms. Knipple contributed to the problem, he does not recall that Ms. Knipple was being disciplined in a similar manner as Plaintiff.  In fact, Mr. Shaffer does not recall if warnings were being placed in Ms. Knipple's personnel file or if she was denied a step increase.  Mr. Shaffer does not recall if disciplinary memoranda were placed in Ms. Knipple's personnel file despite the fact that that Plaintiff alleged that Ms. Knipple had called her a "crybaby", "a psychotic bitch", "a control freak", and a "sneak". (Levesque Letter, dated July 20, 1999, attached hereto as Ex. O)  Furthermore, no action was taken against Ms. Knipple even though Plaintiff alleged that she was verbally attacked and threatened by Ms. Knipple and that Ms. Knipple asserted that Plaintiff had a mental disorder and that she feared Ms. Knipple.  (Shaffer Depo. at 68-69; Levesque Letter, dated July 20, 1999, attached hereto as Ex. O.)  Mr. Shaffer did recall, however, that Plaintiff's file was growing very rapidly during 1999 and 2000.  (Shaffer Depo. at 61.) [1]

Despite the manifest problems in the Assessor's Office and Plaintiff's role in identifying some of them, Defendants never questioned the veracity of Mr. Van Oudenhove's claims about

---

[1] Mr. Sullivan also did not recall any disciplinary measures ever being taken against Ms. Knipple or any warnings ever being placed into her personnel file during this period.  (Sullivan Depo. at 48.)

Plaintiff. (Sullivan Depo. at 45-46, 62-65) This persisted despite the fact that Plaintiff repeatedly

suggested that he was retaliating against her for making a complaint against him, harassing her,

and engaging in ploys to get her to leave the office. (Levesque Memo, dated Jan. 23, 2000,

attached hereto as Ex. P; Levesque Letter, dated July 20, 1999, attached hereto as Ex. O;

Levesque Letter, dated January 18, 2000, attached hereto as Ex. Q; Levesque Memo, dated Nov.

21, 2000, attached hereto as Ex. R). Even the fact that Plaintiff's immediate supervisor, David

Wheeler, wrote in September 20, 2000, that Plaintiff was making a "good work effort and spirit

of cooperation over the [previous] several weeks" did not cause anyone to reassess the situation.

(Wheeler Note, dated Sept. 20, 2000, attached hereto as Ex. S).

    Ultimately, Defendants' decision to terminate Plaintiff was based primarily on Mr. Van

Oudenhove's retaliatory criticisms and complaints. In fact, the entire dysfunctional disciplinary

process was driven by Mr. Van Oudenhove. (*See* Sullivan Depo. at 24, 26, 30, 35-36, 38-51, 56-

66.) Mr. Sullivan admitted that if Plaintiff and Ms. Knipple were treated differently, it was

because "there was a series of complaints from . . . [Mr.] Van Oudenhove, that [Plaintiff] was the

problem." (Sullivan Depo. at 35-36.) Mr. Sullivan acknowledged that Plaintiff's responses to

Mr. Van Oudenhove's criticism and her allegations that she was being treated unfairly were

credible, (Sullivan Depo. at 64-65) but he sided with Mr. Van Oudenhove's version of the facts

every time – even though an independent review by Mr. Ludecke found that Mr. Van

Oudenhove's criticisms of Ms. Levesque were unfounded. (Sullivan Depo. at 64-65.)

    Not only did Defendants retaliate against Plaintiff, they deprived her of constitutionally

mandated due process. The Town typically follows a three-step progressive discipline procedure

for classified civil service employees. (Personnel Rules and Regulations at 28-29, attached

hereto as Ex. T; Shaffer Depo. at 13.) The procedure established by the Town calls for an

employee to be given verbal and/or written warnings, placed on probation, suspended, and ultimately terminated. (Id.) Under this multi-step procedure, "the employee has a chance to know that the supervisor wants to make a communication, has a chance to understand what the problem is, and, thus, give the employee a chance to make the necessary changes." (Sullivan Depo. at 13-14.) In addition, Defendant "look[s] at the entire record . . . [to] make sure that the employee had several opportunities to make the necessary changes. . . [W]e would have a . . . pretermination meeting, to make sure that we were not proceeding on any false basis . . . [and to] give the employee . . . a chance to have union or other representation." (Sullivan Depo. at 15.)

In this situation, however, Defendants did not follow the usual procedure. Defendants admittedly decided to terminate Plaintiff several months before any pre-termination hearing ever took place. (Sullivan Depo. at 68-70, 110.) On January 3, 2001, Plaintiff informed Mr. Shaffer that Mr. Van Oudenhove told her that maybe she should quit. (Levesque Memo, dated Jan. 3, 2001, attached hereto as Ex. U.) Consistent with the account provided by Plaintiff in her letter dated January 3, 2001, Mr. Van Oudenhouve wrote to Mr. Shaffer in February of 2001 requesting that she be terminated immediately. (Van Oudenhove Termination Letter, attached hereto as Ex. V.) Mr. Sullivan explained in his deposition:

> Q:    When was the decision made to terminate Ms. Levesque?
> A:    Somewhere during the time between December and January.
> Q:    Who made that decision?
> A:    It was a combination decision made by Jack [Van Oudenhove] and Larry Shaffer and myself.
> . . .
> Q:    And you indicated Mr. Shaffer was a part of that decision?
> A:    Yes.
> Q:    He participated in the decision to terminate her in December of 2000?
> A:    Yes.
> Q:    And how did he express his assent to that decision? How did he participate in that decision?
> A:    We had a discussion of the issues
> Q:    Who had the discussion?

A:      Larry and I.
Q:      When did that discussion take place?
A:      Sometime right before Christmas.
Q:      You already made up your mind by late December, correct?
A:      Yes.

(Sullivan Depo. at 66-68.)  Even though the determination was clearly made in late December to

terminate Plaintiff, Defendants did not act on the decision immediately because it was

supposedly "hoping that [Plaintiff] might possibly improve."  (Sullivan Depo. at 70.)  Mr. Van

Oudenhove was insistent, however, and wrote two letters in February, 2001, demanding that

Plaintiff be terminated immediately.  (Sullivan Depo. at 70; Van Oudenhove termination memos,

dated February 2001, attached hereto as Ex. V.)

On March 8, 2001, at approximately 4:30 p.m., (Levesque Aff. ¶¶ 14-17), Mr. Sullivan

notified Plaintiff that her pre-termination hearing was scheduled for that day at 5:00 p.m.

Defendants admit that they intentionally deprived Plaintiff her opportunity to prepare for her

hearing and respond to Defendants' allegations.  Defendants intentionally informed Plaintiff of

her pre-termination hearing at the end of the day, thus preventing her from preparing for the

hearing or calling witnesses on her behalf to rebut any specific charges.  (Shaffer Depo. at 82-83,

86-87.)

Defendants admit to a complete disregard for Plaintiff's pre-termination right to due

process.  (*See* Shaffer Depo. at 86-87.)  When Defendants notified Plaintiff, she was not

informed of any specific charges that were being made against her or any specific evidence that

would be involved.  (Pre-hearing Notification Letter, attached as Ex. W; Shaffer Depo. at 83.)  In

fact, the only thing said to Plaintiff when she was handed the letter notifying her of her pre-

termination hearing was that she should clean out her desk.  (Sullivan Depo. at 110-111.)  Thus,

rather than provide Plaintiff an opportunity to prepare a defense, Defendants telegraphed the

8

predetermined nature of the proceeding by instructing her to clean out her desk before the hearing took place.

Plaintiff's so-called pre-termination hearing occurred on the afternoon of March 8, 2001 – just after she had received notice of the meeting and instructions to clear out her desk. The meeting lasted for approximately one half hour. (Levesque Affidavit ¶¶ 17-19; Sullivan Depo. at 111.) The Defendants cannot recall what was discussed at the pre-termination hearing. (Shaffer Depo. at 83, 88-89.) Mr. Sullivan can only vaguely recall a discussion about Plaintiff's lack of desire to have a piece of Ms. Knipple's birthday cake. (Sullivan Depo. at 78-79.) Plaintiff, however, recalls that Mr. Shaffer told her during the meeting that she was being discharged due to uncooperative behavior. She recalls that Mr. Wheeler stated that she was uncooperative to the extent that she would not have a piece of a co-worker's birthday cake. (Levesque Affidavit ¶¶ 17-19) Plaintiff also recalls that when she asked for specific reasons for her discharge during the pre-termination hearing, she was not given any by the participants of the meeting. (Levesque Affidavit ¶¶ 17-19; Plaintiff's Unemployment statement, dated April 30, 2001, attached hereto as Ex. X).

Following the termination, Defendants deliberately disregarded any evidence that supported Plaintiff's continued employment. Many co-workers and acquaintances that Plaintiff had made while working in the Assessor's office signed petitions or wrote letters of recommendation attesting to Plaintiff's professionalism, politeness, and the quality of the work she performed. (Petition, attached hereto as Ex. AA; Noblet Letter, dated March 10, 2001, attached hereto as Ex. BB; Darico Letter, dated March 15, 2001, attached hereto as Ex. CC; Borysevicz Letter, dated March 16, 2001, attached hereto as Ex. DD); McPartland Letter, dated March 20, 2001, attached hereto as Ex. EE; Jerhune Letter, dated April 11, 2001, attached hereto

as Ex. FF; Warner Letter, dated March 31, 2001, Herold Letter, dated Nov. 9, 2000, Scofield & Pippin Letter, dated June 6, 1997, attached hereto as Ex. GG.) Mr. Shaffer, however, ignored all of them. (Shaffer Depo. at 98-110.)

Although a formal notice of termination was not issued for four more days on March 12, 2001,[2] Plaintiff never returned to work for the Town. (Levesque Affidavit ¶¶ 21-23; Sullivan Depo. at 111.) Plaintiff grieved Defendants' decision to terminate her employment. (Levesque Affidavit ¶¶ 21-23; Sullivan Depo. at 111-112.) In April, 2001, Mr. Shaffer presided over the grievance hearing following Plaintiff's termination and reviewed his own earlier decision to terminate Plaintiff. (Levesque Affidavit ¶¶ 21-23; Shaffer Depo. at 119.) Not surprisingly, Mr. Shaffer upheld his earlier decision to terminate Plaintiff. (Levesque Affidavit ¶¶ 21-23; Sullivan Depo. at 112.)

Thereafter, Plaintiff filed the instant action alleging deprivation of liberty, due process, and equal protection; retaliation in violation of the First Amendment to the United States Constitution under 42 U.S.C. § 1983, Conn. Gen. Stat. §§ 31-51m and 31-51q, and defamation. Defendants subsequently moved this Court to enter summary judgment in their favor on each count. Plaintiff hereby opposes Defendants' Motion in its entirety.

---

[2] There is an incredible dispute as to when Defendants decided to terminate Plaintiff. Mr. Sullivan indicated to the Unemployment commission that the decision to terminate Plaintiff in December 2000. (Sullivan Unemployment Statement, attached hereto as Ex. Y.) Mr. Sullivan repeated that assertion during his deposition. (Sullivan Depo. at 70, 110.) Mr. Shaffer, however, contends that the decision was not made until after the conclusion of the pre-termination hearing on March 8, 2001, while Plaintiff asserts that she was told during the pre-termination hearing by Mr. Shaffer that she was being terminated. (Levesque Unemployment Statement, attached as Ex. X.) Ultimately, Plaintiff's recollection is supported by the facts that she was told to clean out her desk before the meeting took place and the fact that she did not return to work after the meeting – even though the Mr. Shaffer's letter informing her of the termination decision was not written for four more days.

### III.    STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith" when the pleadings, depositions, answers to interrogatories, filed admissions and affidavits together demonstrate "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The burden lies with the moving party to demonstrate the absence of any genuine issue of material fact; in that connection, all inferences and ambiguities are to be resolved in favor of the nonmoving party. *See, e.g., Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999).

In the context of employment cases, the appropriateness of summary judgment is "a particularly delicate subject." *Feliciano v. Alpha Sector, Inc.,* 2002 WL 1492139, at *5 (S.D.N.Y. July 12, 2002). The Second Circuit has recognized that a "smoking gun" rarely exists in employment actions, and that the challenged conduct "is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991). A victim, therefore, is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely upon the cumulative weight of circumstantial evidence." *Id.* at 533; *Borrero v. Collins Bldg. Services, Inc.*, 2002 WL 31415511, *7 (S.D.N.Y.2002).

Consequently, courts must be especially cautious in granting the drastic provisional remedy of summary judgment in a case such as this, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference sustaining the plaintiff's claim. *Belfi,* 191 F.3d at 135. Nonetheless, to survive summary judgment in an employment case, a plaintiff "must come forward with at least some credible

evidence that the actions of the [defendants] were motivated by [ ... ] animus or ill will." *Grillo v. New York City Transit Auth.,* 291 F.3d 231, 234 (2d Cir.2002).

In that context, the district court must diligently review the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. See *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996); *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 721 (2d Cir.1994), *cert. denied*, 513 U.S. 1147 (1995). In ruling on a motion for summary judgment, the court asks not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The ultimate question is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250.

## IV.    DISCUSSION

### A.    Defendants Deprived Plaintiff of Her Constitutionally Protected Property Interest Without Due Process in Violation of the Fourteenth Amendment

#### 1.    What Process was Due?

"Public employees who can be discharged only for cause have a constitutionally protected property interest in the tenure, and cannot be fired, without due process." *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 369 (S.D.N.Y. 1999) (citing *Gilbert v. Homar*, 520 U.S. 924, 927-28, 117 S. Ct. 1807, 138 L. Ed.2d 120 (1997)). There is no dispute that Plaintiff was a classified civil service employee with a property interest in her job.

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 541, 105 S. Ct. 1487 (1985) (internal quotation and citation omitted). "In determining what process is due regarding the deprivation of a property or liberty interest, the Supreme Court has set forth three factors that should be balanced:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safe guards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Jenkins v. Area Cooperative Educ. Services*, 248 F. Supp. 2d 117 (D. Conn. 2003) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976)). "Pretermination notice and an opportunity to be heard, coupled with a full adversarial hearing after termination, satisfy the constitutional due process requirements for termination from public employment." *Ogden*, 70 F. Supp. 2d at 369 (citing *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 545-46, 105 S. Ct. 1487, 84 L. Ed.2d 494 (1985)).

In *Loudermill*, the Supreme Court expounded upon the constitutionally required "opportunity to be heard.  The *Loudermill* court explained:

> This principle requires 'some kind of a hearing' prior to the discharge . . . . [S]ome opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision.  Dismissals for cause will often involve factual disputes.  Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect. . . . '[S]omething less' than a full administrative hearing is sufficient prior to the adverse administrative action. . . . The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.  <u>The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.</u>

*Id.* at 542-546 (emphasis added) (internal citations omitted).

Applying the *Loudermill* criteria, a district court in the Second Circuit denied summary judgment on a procedural due process claim brought by a terminated employee because issues of fact remained as to whether the plaintiff:  (a) received "adequate notice of the misconduct charges against him;" (b) was "given sufficient opportunity to gather and present evidence from his personnel file to support his case;"  and (c) was terminated by an "impartial decision-maker." *See Sussman v. New York City Health & Hosp. Corp.*, No. 94 CV 8461, 1997 WL 334964 at *12 (S.D.N.Y. June 16, 1997).

Ultimately, the process due is a matter of state law.  *See Dwyer v. Regan*, 777 F.2d 825, 831 (2d Cir. 1985) (looking to New York state law to determine what process was required).  In *Bartlett v. Krause*, 209 Conn. 352, 551 A.2d 710 (1988), the Connecticut Supreme Court addressed the issue of what process is due for public employees.  In Connecticut, procedural due process is flexible because "not all situations calling for procedural safeguards call for the same kind of procedure." *Bartlett*, 209 Conn. at 377.  *Bartlett*, the Court determined, was a case where more, rather than less, procedure was required because "of the absolute lack . . . of any post-termination procedures at the administrative level." *Id.*  Also among the considerations that persuaded the *Bartlett* court to impose a greater procedural safeguard were the fact that: (1) it was "an absolute deprivation of a property interest that can be terminated only for 'just cause;'"(2) "the procedural safeguards afforded were so minimal and lax as to increase significantly the risk of an erroneous deprivation;" (3) "the complete absence of any statement of the reasons supporting that decision makes judicial review difficult;" and, (4) "[a]ny burden on the defendants, if any there is, in requiring a record of the reasons upon which they acted in rendering their decision and the burden of producing the complainants is minimal at best." *Id.* at

377-79.  Based on those considerations, the *Bartlett* Court held that the plaintiff was entitled to

the following procedural safeguards:

> First, notification in writing of the specific grounds for the proposed dismissal.
> Second, the meaningful opportunity to be heard in her own defense, personally or
> by counsel, at a public hearing, before the defendants have the power of dismissal.
> This meaningful opportunity includes not only the production at the public
> hearing, by the defendants, of the person or persons whose complaints form the
> basis of the ground or grounds in the notification of grounds for potential
> dismissal, but also the opportunity to examine at that time any or all of these
> complainants should the plaintiff decide to do so.  Third, a statement, oral or in
> writing, of the reason or reasons upon which the defendants premise termination
> if that is the sanction imposed.

*Id.* at 380-81.  Because Plaintiff in the instant action and the plaintiff in *Bartlett* were afforded

similarly inadequate procedure, this Court should instruct that Plaintiff receive the same process

as the Connecticut Supreme Court imposed in *Bartlett*.

### 2.    Plaintiff was not Afforded Due Process of Law

In *Bartlett*, the Connecticut Supreme Court observed that the defendant only afforded the

plaintiff a hearing after the decision to terminate her was already made.  209 Conn. at 354, 358.

In addition, the plaintiff in *Bartlett* was not given due process because the defendant's attorney

served as the moderator of that hearing, serving "simultaneously as a moderator and as an

advocate."  *Id.* at 354.  The hearing afforded the plaintiff in *Bartlett* was also deficient because of

its timing (it was held on Friday afternoon at 3 p.m.) and the fact that the "dismissing authority

produce[d] no evidence" at the hearing did not provide the plaintiff an opportunity to "inquire,

cross-examine, and confront her accusers."  *Id.* at 360.

The circumstances that precipitated the instant action are strikingly similar to those in

*Bartlett*.  First, Defendant decided to terminate Plaintiff long before her hearing even took place.

(Sullivan Depo. at 108, 111-113; Sullivan Unemployment Statement, attached hereto as Ex. Y.)[3] Second, the termination of Plaintiff's employment was a permanent and complete deprivation of a constitutionally protected property interest that could only be terminated for "just cause." Third, the process afforded Plaintiff was not intended to satisfy "the need for reaching an accurate decision."

Just like *Bartlett*, Plaintiff was never given "a meaningful opportunity to invoke the discretion of the decisionmaker." Mr. Shaffer, somebody who had ignored Plaintiff's complaints about retaliatory treatment and did not question the accusations leveled against Plaintiff by a supervisor who had self-evident ulterior motives, served as the moderator at the initial hearing and then reviewed his own decision to terminate Plaintiff when she grieved his earlier decision to terminate her. Further, meaningful judicial review of the adequacy of Plaintiff's termination hearing is impossible because no Defendants have any recollection of what was discussed at said meeting. Indeed, Mr. Sullivan can only recall discussing the fact that Plaintiff decided not to eat any of Ms. Knipple's birthday cake – hardly just cause for termination. Finally, as in *Bartlett*, providing additional and adequate process would have imposed a *de minimus* burden upon Defendant.

Indeed, it is self-evident that Defendants merely provided a pretextual sham. In no way was Plaintiff ever given a meaningful opportunity to invoke the discretion of the decision maker. Human Resources Director, Daniel P. Sullivan, admitted that the decision to terminate Plaintiff was made in December 2000 – three months before any hearing ever took place. (*See* Sullivan Unemployment Statement, "The decision to discharge Maryann was made in December 2000, but was postponed until after the holidays;" Sullivan Depo. at 108, 111-113) Moreover, Sullivan

---

[3] Although the evidence supports this proposition, Mr. Shaffer maintains that the decision to terminate Plaintiff was not made until after her pre-termination hearing had taken place. To that extent, there is a disputed issue of material fact as to when the decision was made to terminate Plaintiff, which precludes summary judgment.

instructed Plaintiff to clean out her desk before the termination hearing even took place. (Sullivan Depo. at 110-111, 112-113.)

Furthermore, Plaintiff was given no meaningful notice of her pre-termination hearing. Mr. Shaffer admitted that they intentionally gave the pre-termination letter to Plaintiff "very late in the day" on the same day on which her termination hearing was scheduled to take place. (Shaffer Depo. at 82.) Mr. Shaffer also admitted that the memo provided to Plaintiff informing her of the pre-termination hearing did not specify the grounds for dismissal, any specific disciplinary charges, or any specific evidence that was going to be considered in connection with Plaintiff's termination. (Shaffer Depo. at 83.) Finally, the manner in which Plaintiff received notice of her termination hearing, and the time at which Defendants' scheduled the termination meeting, made it virtually impossible for Plaintiff to bring forth any witnesses on her behalf before she was terminated. (*See* Shaffer Depo. at 93-94.)

In fact, the record is devoid of any evidence that Plaintiff was informed, before Defendants fired her, of the reasons necessitating her termination. The termination letter did not inform Plaintiff of any of the specific charges against her or the evidence supporting those charges. The termination hearing lasted approximately a half an hour and the only specific issue that participants could recall being discussed related to an incident where Plaintiff did not want a piece of Ms. Knipple's birthday cake. (Sullivan Depo. at 108-109; Shaffer Depo. at 88-89.) Moreover, Defendants refused to consider evidence contrary to its predetermination to terminate Plaintiff. (*See*, *e.g.*, Shaffer Depo. at 98-117.)

Thoroughly underscoring the absolute absence of any due process, the same individual who terminated Plaintiff, Town Administrator Laurence Shaffer, presided over the appeal of Defendants' decision to terminate Plaintiff. (Sullivan Depo. at 112; Shaffer Depo. at 118-119.)

The very purpose of an opportunity to appeal is to reexamine and reevaluate the earlier decision made at the termination hearing. It is inconsistent with that purpose to allow the same individual who decided to terminate Plaintiff after a pre-termination hearing to be the sole individual hearing the appeal of his earlier decision. *See Adams v. Sewell*, 946 F.2d 757, 765-766 (11th Cir. 1991), *overruled on other grounds*, *McKinney*, 20 F.3d at 1550. The fact that Mr. Shaffer presided over both the pre-termination hearing and the appeal of the decision to terminate further reveals that the process afforded Plaintiff was a pre-textual sham. Mr. Shaffer's admission that he did not consider any of the evidence that Plaintiff presented after her termination renders this conclusion inescapable.

Defendants' argument that "Plaintiff was appropriately terminated by the Town for cause under the provisions of the Personnel Rules," is irrelevant. (Def's Mem. Supp. Summ. J. at 23.) Plaintiff's procedural due process claim challenges the sufficiency of the process she was afforded, not necessarily the appropriateness of Defendants' decision to terminate. Furthermore, Defendants suggest that "Plaintiff was further presented with written notice of a pre-termination meeting to give her an opportunity to respond to the Town's decision to terminate her from employment." (Def's Mem. Supp. Summ. J. at 23.) Defendants fail to disclose, however, that they did not provide Plaintiff with written notice of the pre-termination hearing until less than an hour before the pre-termination meeting was set to take place. (Sullivan Depo. at 110.) Moreover, Defendants do not disclose that said written notice of the pre-termination hearing was devoid of any reference to evidence compiled against the Plaintiff or any explanation of charges that would justify her termination and that Mr. Sullivan admits he did not provide Plaintiff with details not included in the letter. (See Pre-termination Letter, attached as Exhibit W; Sullivan Depo. at 112-113.) In fact, when he gave the pre-termination letter to Plaintiff, the only thing

Mr. Sullivan told Plaintiff was that she needed to clean out her desk. (Sullivan Depo. at 110-111, 112-113.) Finally, Defendants do not discuss the fact that Mr. Shaffer administered both the pre-termination hearing and the subsequent post-termination appeal without any other independent review of the evidence. Each of these omissions is fatal to their motion.

3.      Disputed Issues of Material Fact Preclude Summary Judgment on Plaintiff's Due Process Claim.

A Court should deny a motion for summary judgment when a triable issue of fact exists as to whether the process afforded the plaintiff was a sham. *See Adams v. Sewell*, 946 F.2d at 765-766 (11th Cir. 1991). In *Adams*, the defendant appealed a jury verdict in favor of the plaintiff on his procedural due process claim. The Eleventh Circuit upheld the jury's verdict, however, holding that a reasonable jury could have concluded that the process afforded the plaintiff was just a sham.

Many of the factors relied upon by the *Adams* court regarding the deficiency of the pre-termination and post-termination process afforded to the plaintiff are also present in the instant action. First, the plaintiff in *Adams* was given insufficient notice of the charges against him and no opportunity to prepare for his pre-termination hearing or present evidence on his behalf. *Id.* at 765. Second, the defendant only made vague, subjective allegations about the plaintiff before his termination that were difficult to refute. *Id.* Third, the post-termination grievance was administered by the same individual who made the initial termination decision. *Id.* at 765-766. Finally, the plaintiff was given no opportunity to cross-examine his accuser. *Id.* at 766. Since each of those facts are also present in the instant action, a reasonable jury could find that Defendants failed to provide Plaintiff with constitutionally adequate due process of law both before and after her termination.

Furthermore, additional material facts are in dispute in the instant action regarding whether the process afforded Plaintiff was just a pretextual sham. For example, Mr. Sullivan has testified under oath in his deposition that the decision to terminate Plaintiff was made in December, 2000 – three months before her termination hearing took place. Mr. Sullivan's recollection is supported by the fact that he told her to clean out her desk at the same time that he notified her about the termination hearing that was scheduled to take place in less than an hour.

Mr. Shaffer, however, disputes Mr. Sullivan's recollections and, although he admits to intentionally notifying Plaintiff late in the afternoon on the same day that her termination hearing was to take place, maintains that the decision to terminate Plaintiff was not made until after the termination hearing in March, 2001. Mr. Shaffer supported his recollection of events with a self-serving explanation of his belief in the promise and potential of his employees and the hope that they may correct any faults and improve for the better.

Coupled with the dispute as to whether Defendants decided to terminate Plaintiff in December, 2000 are the following: Mr. Shaffer administered the post-termination grievance and reviewed his own determination to fire Plaintiff; Defendant ignored any evidence supporting the proposition that Plaintiff was a good worker; Defendants did not question the veracity of Mr. Van Oudenhove's assertions that Plaintiff was to blame for the problems in the office when one of his principal complaints about Plaintiff was that she corrects his mistakes and discusses them outside the office, and they ignored the fact that Plaintiff did not have any documented problems at work before Ms. Knipple began working for the Town.

4.     Defendants' Termination of Plaintiff was *Ultra Vires*

Agents of a municipality are limited in their authority by the terms of the town charter. "It has been well established that a city's charter is the fountainhead of municipal powers . . . .

20

The charter serves as an enabling act, both creating power and prescribing the form in which it must be exercised . . . .  Agents of a city . . . have no source of authority beyond the charter . . . . [T]heir powers are measured and limited by the express language in which authority is given or by the implication necessary to enable them to perform some duty cast upon them by express language."  *Fennell v. City of Hartford*, 238 Conn. 809, 813, 681 A.2d 934 (1996) (internal citations and quotations omitted).

In the instant action, the Charter of the Town of Vernon expressly prohibited the Town Administrator, Mr. Shaffer, from disciplining or terminating Plaintiff's employment.  In Chapter XI, Section 6, the Charter establishes that the Town Administrator ". . . . shall be directly responsible . . . for . . . [a]dminister[ing] the merit system for classified employees, **except as to appointments, discipline, suspension, or removal of employees**; . . . ."  (Town Charter Ch. XI, § 6(9), attached hereto as Ex. E.)[4]

Therefore, it is clear that under the Charter of the Town of Vernon, Mr. Shaffer lacked the legal authority to terminate Plaintiff.  Accordingly, even if Plaintiff was afforded sufficient notice and due process before and after her termination, the decision to terminate Plaintiff violated her due process rights because Mr. Shaffer lacked the legal authority to make such a decision under the Town Charter.

For the foregoing reasons, a reasonable jury could conclude that the process Defendants afforded Plaintiff, both before and after her termination, was a pretextual sham.  Accordingly,

---

[4] Despite this express limitation on the power of the Town Administrator, the Personnel Rules and Regulations establish that the Town Administrator is the individual responsible for terminating employees.  (*See*, *e.g.*, Personnel Rules and Regulations § 11.2, attached hereto as Ex. T) ("the first step of the disciplinary procedure may begin with a suspension, and subsequent termination by the Town Administrator.").

Defendants' Motion for Summary Judgment as to Count One of Plaintiff's Complaint should be denied.

**B.    Defendants Wrongfully Terminated Plaintiff in Retaliation for Speaking Out on a Matter of Public Concern in Violation of Sections 1983 and 31-51q**

"It is well-settled that a public employee asserting a First Amendment retaliation under section 1983 must initially demonstrate by a preponderance of the evidence that (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination, such that it can be said that his speech was a motivating factor in the determination." *Ritz v. Town of East Hartford*, 110 F. Supp. 2d 94, 102 (D. Conn. 2000) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).

Plaintiff alleges that Defendants violated § 1983 and General Statutes § 31-51q for terminating Plaintiff in retaliation for Plaintiff's constitutionally protected speech on a matter of public concern. Defendants erroneously contend that Plaintiff's speech is: (a) time-barred, (b) not on a matter of public concern, and (c) not causally connected to Defendants' decision to terminate Plaintiff. As Plaintiff's allegations are sufficiently supported by the facts and Defendants' arguments are flawed, this Court should deny Defendants' Motion for Summary Judgment as to Counts Two and Five of Plaintiff's Complaint.

### 1.    Plaintiff Spoke on a Matter of Public Concern

Speaking out on matters concerning waste, misallocation, and loss of public funds is certainly a matter of public concern. *See, e.g., Vasbinder v. Ambach*, 926 F.2d 1333, 1339-1340 (2d Cir. 1991); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 553 n.4 (2d Cir. 2001); *A.F.C. Enterprises v. New York City School Construction Auth.*, No.

98CV4534, 2001 WL 1335010 at **14-15 (S.D.N.Y. Sept. 6, 2001). Plaintiff's speech addressing mismanagement, abuse of authority, and/or waste taking place within the Town Assessor's office that resulted in violations of Town policies and procedures, mistaken tax bills, and errors in the collection of local property taxes clearly addressed matters of public concern because of the clear connection of each topic to the public fisc.

Further, Plaintiff's speech was not simply a private grievance on a matter of personal interest. Mr. Van Oudenhove's instruction to Plaintiff that she stop checking his work and talking about mistakes outside of the office is prima *facie evidence* that Plaintiff engaged in protected speech on a matter of public rather than private concern.

Moreover, this issue, whether a plaintiff is motivated by simply personal and private concerns, is not appropriately addressed at this time as it is a question of fact for the jury to resolve. *Cotto v. United Technologies Corp.*, 251 Conn. 1, 47, 738 A.2d 623 (1999) ("Because a plaintiff's motivation necessarily involves a question of fact to be resolved by a jury, it should not be concluded as a matter of law that the motivation was purely personal" (citing *Daley*, 249 Conn. at 778)). The Connecticut Supreme Court has clearly held that whether a plaintiff's speech about a matter of public concern was truly "motivated to champion the rights of others, rather than to air her own personal grievance" is a question of fact for the jury to resolve. *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 782-784, 734 A.2d 1112 (1999). Because a reasonable factfinder could find that Plaintiff was not motivated by only personal or private reasons, the issue of Plaintiff's motivation must be resolved by a jury – not this Court.

> 2.   There is a Causal Connection Between Plaintiff's Termination and
>       <u>Her Protected Speech</u>

"A plaintiff can establish the causal connection between protected expression and an adverse employment determination indirectly by showing that the protected activity was

followed by adverse treatment in employment, or directly by evidence of retaliatory animus."

*Cobb v. Pozzi*, 352 F.3d 79, 97 (2d Cir. 2003) (citations and quotations omitted).  There is ample

evidence that Defendants, especially Mr. Van Oudenhouve, engaged in continued adverse

treatment against Plaintiff in retaliation for her protected conduct that culminated in her

termination.  Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's claims

should be denied.

      While employed by the Town, Plaintiff often corrected mistakes made by others in the

Town Assessor's Office.  In fact, at one point in 1996, Plaintiff discovered that the Town failed

to collect over $171,000 in tax revenue from certain entities.  (*See* News Article, attached as

Exhibit I.)  Plaintiff's discoveries and her attempts to correct such mistakes clearly angered her

supervisor, Mr. Van Oudenhove, whose job performance was being monitored by the Town.

(Shaffer Depo. at 61, 72-73.)  In fact, Mr. Van Oudenhove memorialized his displeasure when he

specifically instructed Plaintiff to stop checking the work done by supervisors and not to discuss

outside of the office any mistakes she discovered.  (*Id.*)

      It is against this background that the events precipitating Plaintiff's termination must be

examined.  The reasons cited justifying Defendants' decision to terminate Plaintiff all stem from

the troubled working relationship between Plaintiff and Ms. Knipple, who was hired by the

Town in late 1998.  Before Ms. Knipple began working for the Town, neither Plaintiff's work

performance nor her relationship with her co-workers were problematic.  (*See* Shaffer Depo. at

61.)  Once the relationship between Plaintiff and Ms. Knipple led to problems, Plaintiff's

supervisor, Mr. Van Oudenhove, immediately and persistently assigned blame for those

problems to Plaintiff and falsely designated her as the responsible party.  (Sullivan Depo. at 36.)

In light of Plaintiff's sound work record and Van Oudenhove's complaints about looking over

his work, discovering his mistakes and discussing them with others outside of the office, the retaliatory motive for assigning blame on Plaintiff is self-evident.

Throughout 2000, Mr. Van Oudenhove repeatedly reprimanded Plaintiff in correspondence that began to amass in Plaintiff's personnel file. (Shaffer Depo. at 61; Sullivan Depo. at 45-46, 50-51.) Defendants did not investigate, or examine the veracity of, Mr. Van Oudenhove's complaints about Plaintiff and his requests that she be terminated. (*Id.*) Mr. Shaffer failed to perform any review of the situation even though he was aware of the following facts: (a) Plaintiff did not have any problems before Ms. Knipple was hired; (b) Mr. Van Oudenhove complained that Plaintiff was checking his mistakes and discussing them outside of the office; (c) Plaintiff complained that she was being singled out and harassed by others in her office; (d) real problems existed in the Assessor's Office; and (e) numerous individuals submitted statements attesting to the fact that Plaintiff performed her job well.

Despite this knowledge, Mr. Shaffer never spoke with others about the veracity of Plaintiff's claims that she was being harassed and singled out for harassment and discipline by others in her Department. Even though he knew problems existed in the Department, Mr. Shaffer never asked Mr. Van Oudenhove what mistakes Plaintiff was correcting and why, if she was correcting them, did Mr. Van Oudenhove want her to stop making those corrections. Mr. Shaffer did not consider the positive performance reviews written by others about Plaintiff's character and job performance. (*See* Shaffer Depo. at 101, 109-111.) Defendants simply took Mr. Van Oudenhove's complaints at face value, accepted them as truth, and terminated Plaintiff because of his assessment in the face of information that would lead a reasonable person to question Mr. Van Oudenhove's motivation. (Sullivan Depo. at 45-46, 50-51, 62-63, 65.)

Thus, in the instant action, there is certainly evidence that Plaintiff suffered adverse treatment in her employment, at the hands of her supervisor, Mr. Van Oudenhove, after she engaged in protected conduct.  As Mr. Shaffer and Mr. Sullivan freely admit, the decision to terminate Plaintiff was based on Mr. Van Oudenhove's repeated complaints about Plaintiff and the fact that she checked his work and reported those mistakes to others outside of the office.  A reasonable person could certainly infer that Defendants' decision to terminate Plaintiff, because it was driven by Mr. Van Oudenhove, was at least partially motivated by her protected speech. Under the circumstances, summary judgment is inappropriate.

### C.   Defendants Denied Plaintiff Equal Protection Under the Law

"The Equal Protection Clause requires that the government treat all similarly situated people alike."  *Harlen Assoc. v. Incorporated Village of Mineola*, 273 F.3d 493, 499 (2d Cir. 2001).  Even if they do not belong to a "vulnerable class," the Equal Protection Clause also protects individuals "who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials."  *Id.*

To establish an equal protection claim under § 1983, a plaintiff must show that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *LeClair v. Saunders*, 627 F.2d 606, 609-610 (2d Cir. 1980).  As Plaintiff has met her burden of proof as to each element, Defendants' Motion for Summary Judgment as to Count Three of Plaintiff's Complaint should be denied.

      1.    Defendants Treated Plaintiff Differently Than Similar Situated
            <u>Employees</u>

The United States Supreme Court has held that a public entity violates the Equal

Protection Clause of the Constitution by "intentionally treat[ing] [an individual] differently from

others similarly situated [if] there is no rational basis for the difference in treatment. . . . The

purpose of the equal protection clause of the Fourteenth Amendment is to secure every person

within the State's jurisdiction against intentional and arbitrary discrimination, whether

occasioned by express terms of a statute or by its improper execution through duly constituted

agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

Plaintiff and Ms. Knipple were undeniably similarly situated employees – they held the

same job title in the same Town office. Defendants recognized that both employees were

involved in Employee Assistance Counseling to resolve their dispute. (*See* Def's Mem. Law

Supp. Summ. J. at 33.) Defendants do not explain, however, why it was a rational decision to

terminate Plaintiff, and not Ms. Knipple, when the dispute resulting from their relationship

persisted. Plaintiff worked for the Town for a longer period of time, had more relevant training,

and had no disciplinary problems before Ms. Knipple began working for the Town.

To the contrary, Mr. Shaffer and Mr. Sullivan essentially ignored Plaintiff's claims that

she was being singled out and harassed by others in the department unfairly. Defendants

principally terminated Plaintiff based on the recommendation of her supervisor, Mr. Van

Oudenhove, who had suffered embarrassment at the hands of Plaintiff when she discovered his

mistakes. Defendants did not question the motivation behind or the veracity of Mr. Van

Oudenhove's account even after learning that a principal criticism by Mr. Van Oudenhove's of

Plaintiff was that she corrected his mistakes and talked about mistakes outside the Assessor's

Office at a time when his performance was being scrutinized by Mr. Shaffer and Mr. Ludecke.

Furthermore, Defendant did not question the veracity of Mr. Van Oudenhove's criticisms against Plaintiff when previous charges leveled against Plaintiff by Van Oudenhove had been discredited by Mr. Ludecke – who essentially concluded that Mr. Van Oudenhove's own shortcomings were the cause of the problems of which he complained.

      2.    Defendants' Disparate Treatment of Plaintiff was Motivated by an <u>Impermissible Reason</u>

Defendants' termination of Plaintiff was based on an impermissible motive.  Mr. Van Oudenhove's serial complaints about Plaintiff, laying the blame at her feet for the problems between Plaintiff and Ms. Knipple, were manifestly motivated by his desire to punish and inhibit her constitutionally protected speech about the mistakes taking place within the Assessor's office.  Because Defendants' decision to terminate Plaintiff was effectuated pursuant to Mr. Van Oudenhove's impermissibly motivated complaints about Plaintiff, the termination, as well as the adverse treatment Plaintiff suffered at the hands of Mr. Van Oudenhove, violated Plaintiff's constitutional right to equal protection under the law.

Defendants have failed to put forth any evidence explaining that, in light of all the relevant facts, it was rational to terminate Plaintiff instead of Ms. Knipple.  In fact, the facts reveal that Defendant's decision to terminate Plaintiff, rather than Ms. Knipple, was arbitrary and irrational and therefore unconstitutional. Indeed, problems with Ms. Knipple have persisted after Plaintiff's termination. Accordingly, Defendants' Motion for Summary Judgment as to Count Three of Plaintiff's Complaint should be denied.

**D.       Defendants Wrongfully Discharged Plaintiff in Violation of Section 31-51m**

1.       Plaintiff Timely Filed Her Claim Under Section 31-51m

Defendants erroneously rely on inapplicable precedent and argues in favor of a misguided rule.  Defendant's reliance on cases where jurisdiction was asserted based on diversity is misplaced.  Plaintiff's cause of action is not premised on diversity jurisdiction; instead, Plaintiff's Complaint presents several federal questions and expressly alleges jurisdiction pursuant to 28 U.S.C. §§ 1331,1343(3) and 1367.  Therefore, each case cited by Defendants where the court asserted jurisdiction on grounds of diversity, not a federal question, are distinguishable and inapplicable.  Accordingly, Defendants' argument that Plaintiff's claim under § 31-51m should be summarily rejected.

The fact that Plaintiff's Complaint asserts federal question jurisdiction is dispositive on this issue.  As the Supreme Court has made clear in cases such as *Hanna v. Plumer*, 380 U.S. 460 (1965), when deciding *Erie* questions, the "twin aims of *Erie*" must instruct the court's ruling. *Hanna*, 380 U.S. at 468.  As set forth by the Supreme Court, the twin aims of *Erie* are "the discouragement of forum-shopping and the avoidance of the inequitable administration of the laws."  *Id.*

The "twin aims of *Erie*" do not require the dismissal of Plaintiff's 31-51m claim in the instant action.  First, as stated by the *Hanna* court, "it is difficult to argue that [the manner in which the plaintiff must serve the defendant] alters the mode of enforcement of state-created rights in a fashion sufficiently 'substantial' to raise the sort of equal protection problems to which the Erie opinion alluded."  *Id.* at 469.  Likewise in the instant action, the date upon which the action is commenced for the purpose of the statute of limitations is not the equal protection problem that motivated the *Erie* court.

Second, the apprehension over forum-shopping is likewise not present in the instant action because, as already alluded to, Plaintiff's Complaint does not assert diversity jurisdiction. Plaintiff did not choose to bring a state law cause of action in federal court simply to get around the statute of limitations that would have precluded her 31-51m claim. Plaintiff brought her state law claim in federal court because her Complaint also alleged several federal causes of action and consolidation of her claims conserves judicial resources and avoids inconsistent results. Therefore, there is no *Erie* question.

Moreover, Defendants advocate an untenable rule. Defendants advocate that the Court observe two different dates of service for the causes of action stated in Plaintiff's Complaint, even though Plaintiff served them upon Defendants the simultaneously. Defendants request that this Court observe that Plaintiff served its federal claims upon Defendants on July 13, 2001, but that Defendant did not receive notice of Plaintiff's state law claims, even though they were part of the same Complaint, until July 18, 2001.

Defendants have requested that this Court recognize an untenable legal fiction that is completely contrary to the letter and spirit of supplemental jurisdiction under 28 U.S.C. § 1367 – Defendants want the Court to recognize different commencement dates for federal and state claims contained in the same complaint. This is unworkable.

A plaintiff filing in federal court should only be expected to follow the guidelines and rules set forth under the Federal Rules of Civil Procedure. Rule Three specifically states that "[a] civil action is commenced by filing a complaint with the court." When bringing a state law claim in federal court under § 1367, a plaintiff cannot be held accountable to a contradictory state law rule that says that an action does not commence until the defendant is served. Simply put, the state law procedural rule must yield when a state law procedural rule regarding the

service of process conflicts with a constitutionally authorized Federal Rule of Civil Procedure,.

*Hanna v. Plumer*, 380 U.S. at 468-69.

Section 1367(c) sets out several exceptions by which the district court may refuse to

entertain jurisdiction over the Plaintiff's state law claims. Defendants have not met their burden

of establishing that Plaintiff's claim fits within any of those exceptions. Accordingly, the Court

should reject Defendants' argument that Plaintiff's 31-51m claim is time barred.

2.    Defendants are not Entitled to Judgment as a Matter of Law on
Plaintiff's 31-51m Claim

Defendants, as the parties moving for summary judgment, have the burden of showing

that there are no disputed issues of material fact and that it is entitled to judgment as a matter of

law. Defendant has not met its burden on this issue as to Plaintiff's 31-51m claim. Defendants

summarily asserts that Plaintiff has not met each element of her claim, but Defendant does not

explain any of its assertions.

Contrary to Defendants' unsupported assertions, Plaintiff has satisfied each element of

her 31-51m claim. A plaintiff must satisfy three elements under § 31-51m: "(1) that the

plaintiff engaged in a protected activity as defined by § 31-51m(b); (2) that the plaintiff was

subsequently discharged from [her] employment; and (3) that there was a causal connection

between his participation in the protected activity and his discharge." *Arnone v. Town of Enfield*,

79 Conn. App. 501, 507, 831 A.2d 260 (2003). In *Ritz v. Town of East Hartford*, 1998 WL

154541 at **4-6 (D. Conn. March 18, 1998), the Court held that a municipal employee who

reports mismanagement and abuse of authority internally to town officials states a claim under §

31-51m.

A defendant is not entitled to summary judgment on a plaintiff's 31-51m claim if there is a genuine issue of material fact as to whether there was a causal connection between the plaintiff's protected activity and the termination of her job. *Ritz v. Town of East Hartford*, 110 F. Supp. 2d 94, 99-100 (D. Conn. 2000) (denying defendant's motion for summary judgment because material facts were in dispute as to causal connection). In the instant action, a reasonable jury could infer that Mr. Van Oudenhove decided to blame Plaintiff for the problems between her and Ms. Knipple because, as he admits in written correspondence, he was unhappy that she corrected his mistakes and reported them to others. As Mr. Shaffer and Mr. Sullivan also admit, they decided to terminate Plaintiff instead of Ms. Knipple because of Mr. Van Oudenhove's description of events and his recommendation that Plaintiff be terminated.

Furthermore, Defendants apparently do not refute the underlying examples of mismanagement and abuse of authority upon which Plaintiff bases her claim. In her response to Defendants' Interrogatory No. 3, Plaintiff indicated that:

> Jack Van Oudenhove refused to correct Thomas Mason's taxpayer's bill to reflect Mr. Mason's veteran's exemption.
>
> Anthony Guardini was over assessed and Jack Van Oudenhove would not allow an appropriate refund.
>
> Although he did not properly understand the system, Jack Van Oudenhove improperly warned Plaintiff about deleting accounts of non-resident vehicles and duplicate vehicles.
>
> Jack Van Oudenhove under assessed Restaurant 99. Mr. Van Oudenhove did not do any personal or real estate property fieldwork. As a result approximately $100,000 was under assessed which would have [cost] the town roughly $18,000 over a three (3) year period. Plaintiff caught Mr. Van Oudenhove's mistake and was able to collect approximately $18,000 in taxes. Town Counsel was also made aware of this problem.

(Plaintiff's Response to Def's Interrogatory No. 3.)  Accordingly, for the foregoing reasons,

Defendants' Motion for Summary Judgment as to Count Five of Plaintiff's Complaint should be

denied.


**E.    Defendants Deprived Plaintiff of a Liberty Interest in Violation of the Fourteenth Amendment**

1.    Defendants' Allegations are Sufficiently Stigmatizing

"A government employee's liberty interest is implicated where the government dismisses

him based on charges that might seriously damage his standing and associations in his

community or that might impose on him a stigma or other disability that forecloses his freedom

to take advantage of other employment opportunities.  For example, charges that the employee is

guilty of dishonesty or immorality are stigmatizing because they call into question the person's

good name, reputation, honor, or integrity.  In addition, the charges against the employee must be

made public by the government employer, and the employee must allege that the charges are

false. Where the employee's liberty interest is implicated, he is entitled under the due process

clause to notice and an opportunity to be heard." *Brandt v. Bd. of Co-op Educational Services*,

820 F.2d 41, 43 (2d Cir. 1987) (internal citations and quotations omitted).

"[A] defamatory statement about an employee implicates a liberty interest when it is

made during the course of that employee's termination from employment." *Donato v. Plainview-*

*Old Bethpage Central School Dist.*, 96 F.3d 623, 630 (2d Cir. 1996).  "Such allegations will

support a right to a name-clearing hearing only when they denigrate the employee's competence

as a professional and impugn the employee's professional reputation in such a fashion as to

effectively put a significant roadblock in that employee's continued ability to practice his or her

profession." *Id.* at 630-631.

The accusations made about Plaintiff in the instant action by Mr. Van Oudenhove in order to effectuate her termination are clearly stigmatizing under established precedent. The Second Circuit has previously held that allegations that an employee has psychological problems are defamatory statements that implicate a liberty interest. *See, e.g., Velger v. Cawley*, 525 F.2d 334 (2d Cir. 1975) (holding that an accusation that a police officer attempted to commit suicide was stigmatizing and therefore implicated a liberty interest), *reversed on other grounds sub nom., Codd v. Velger*, 429 U.S. 624 (1977); *Lombard v. Bd. of Educ. of City of New York*, 502 F.2d 631, 637-638 (2d Cir. 1974), *overruled on other grounds, Gargiul v. Tompkins*, 790 F.2d 265 (2d Cir. 1986). Furthermore, Defendants' false allegations about Plaintiff undoubtedly discredit her ability to perform her job and, if disclosed, would deprive Plaintiff of job opportunities. *See, e.g., Brandt v. Board of Co-op Educ. Services*, 820 F.2d 41, 44-46 (2d Cir. 1987).

Defendants have certainly made false allegations about Plaintiff's job performance as well as her psychological and social capacity that would have a detrimental effect on her ability to procure future employment. For instance, Mr. Van Oudenhove wrote that:

> She **cannot perform the daily work duties** without taking excessive breaks and constantly disturbs the office and all around her . . . . **She appears to have a persecution complex** as she is always taking issue with the most mundane task or directive. . . . Plaintiff] hoards information . . . . Fellow employees have difficulty with her . . . . She has difficulty accepting responsibility for her actions . . . .

(Van Oudenhove Letter, dated February 2, 2001, attached hereto as Ex. V)(emphasis added). Three weeks later, Mr. Van Oudenhove once again wrote to Mr. Shaffer. He pleaded for Mr. Shaffer to "[p]lease, permanently remove [Plaintiff] from [the office]." (Van Oudenhove Letter, dated February 23, 2001, attached hereto as Ex. V) (emphasis in original). He explained that:

> [s]he has continued to become increasingly disruptive to the office and demonstrates a very poor work attitude. [Plaintiff] does not interact with fellow

employees and does not conform to office policies.  This behavior problem has been well documented and is not acceptable.  She visits other town departments and shares **her self-induced problems** with others . . . .

(*Id.*) (emphasis added).  Later, after Plaintiff's termination, Mr. Sullivan told the unemployment commission that Plaintiff was discharged because she "[exhibited] uncooperative behavior, disruptive behavior, [a] failure to follow supervisor's instructions, [left] the office without permission, and [was] unable to get along with supervisors and co-workers."  (Sullivan Statement, attached hereto as Ex. Y.)

Defendant's allegations about Plaintiff paint a picture of an incompetent, anti-social, paranoid, disgruntled employee who has a "persecution complex" that made it impossible for her to work effectively with all her supervisors and co-workers.  Defendant has failed to support its allegations about Defendant with any evidence.  In fact, an abundance of evidence exists which expressly contradicts many of Defendant's justifications for Plaintiff's termination.  Peter Korbusieski, the Tax Collector who worked in the same office as Plaintiff, Van Oudenhove and Knipple, characterized Plaintiff as a cooperative employee who got along very well with him and the employees in his office.  (Korbusieski Depo. at 23.)  He also indicated that Ms. Knipple, not Plaintiff, was responsible for the problems in the office and that Ms. Knipple had problems with other employees in the office besides Plaintiff and that those problems persisted after Plaintiff's termination.  (*See* Korbusieski Depo. at 26-29, 31, 40-42.)

In addition to Mr. Korbusieski, dozens of co-workers and members of the public have written letters of praise on Plaintiff's behalf describing her as a good person who was helpful and easy to work with.  In fact, David Wheeler, the Assistant Assessor and Plaintiff's immediate supervisor, acknowledged Plaintiff's "good work and spirit of cooperation" and informed Plaintiff he thought that she was doing an "outstanding job" only months before she was

terminated.  (Wheeler Letter, dated September 20, 2000, attached hereto as Ex. S.)

Commensurate with that appraisal, Mr. Wheeler wrote a letter of recommendation on Plaintiff's

behalf on November 20, 2000, just a month before Mr. Sullivan indicated that Defendants

decided to terminate Plaintiff, in which he wrote that she was "very knowledgeable in all aspects

of her job" and "shows positive initiative in the workplace and has demonstrated the ability to

achieve any goal she wishes to attain . . . I know that her presence in your office will be your

gain."  (Wheeler Recommendation, dated November 20, 2000, attached hereto as Ex. Z.)

       In addition, thirteen of Plaintiff's co-workers signed a petition attesting to the fact that

Plaintiff "was always very helpful and professional . . . Whenever a member of the public had to

be referred to the Assessor's office, when staff needed information, [Plaintiff] . . . could be

depended upon for an accurate and timely response."  (Petition, attached hereto as Ex. AA.)

Patty Noblet, a member of the Board of Assessment Appeals, wrote a glowing letter of Plaintiff's

behalf.  Ms. Noblet wrote that "[Plaintiff] manages to provide quality assistance in a friendly,

accurate and timely manner.  My co-workers . . have [also] commented on how helpful and

responsive she is.  My general observations of [Plaintiff] are that she is always courteous,

professional, and patient with the public, and seems readily willing to assist in whatever is

needed . . . [Plaintiff] is always working."  (Noblet Letter, dated March 10, 2001, attached hereto

as Ex. BB.)  At the close of the five-paragraph letter, Ms. Noblet indicated to Mr. Shaffer her

willingness to be contacted on the matter.  (Id.)

       Other co-workers and members of the public also wrote to Mr. Shaffer in support of

Plaintiff.  They characterized her as "very cooperative . . . very polite, truthful, and . . . a

dedicated worker," (Darico Letter, dated March 15, 2001, attached hereto as Ex. CC); "helpful,

professional, and polite . . . patient and helpful," (Borysevicz Letter, dated March 16, 2001,

attached hereto as Ex. DD); "courteous and professional . . . It has always been a pleasure dealing with her.  I will miss her . . . .," (McPartland Letter, dated March 20, 2001, attached hereto as Ex. EE); "one of the <u>most</u> courteous, professional and helpful people I have encountered . . . pleasant attitude, quick smile, extensive knowledge . . . and her respect for all town residents," (Jerhune Letter, dated April 11, 2001, attached hereto as Ex. FF).  (*See also* Warner Letter, dated March31, 2001; Herold Letter, dated Nov. 9, 2000; Scofield & Pippin Letter, dated June 6, 1997, attached hereto as Ex. GG.)

Defendants, even though they move this Court to enter Summary Judgment on their behalf, do not address these testimonials praising Plaintiff.  Defendants appear to be following the practice of Mr. Shaffer, who disregarded any opinion of others that contradicted his own preconceived impressions and determinations.  (*See* Shaffer Depo. at 98-110.)  Thus, there are certainly sufficient disputes as to the falsity of Defendants' allegations that a reasonable jury could find that Defendants' stigmatizing allegations were untrue and would dissuade any potential future employer from hiring Plaintiff.

2.    Defendants Published False Allegations About Plaintiff

The Second Circuit has held that placing stigmatizing documents in an employee's personnel file during the termination process constitutes publication that implicates a liberty interest under the Due Process Clause.  *See Brandt*, 820 F.2d at 45.  *See also Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 27-28, 662 A.2d 89 (1995).  In the instant action, the false and stigmatizing allegations made by Defendants about Plaintiff's job performance and psycho-social capacity were placed in Plaintiff's personnel file.  Accordingly, Defendants' assertion that the allegations made about Plaintiff were not published, (*see* Def's Mem. Supp. Summ. J. at 38), is erroneous.  To the extent that Defendant contends that the

allegations were not placed in Plaintiff's personnel file, an issue of fact remains that must be resolved by the jury.

### 3.    Defendant Van Oudenhove's Statements Were Not Privileged

"There are two facets to the defense of privilege.  The occasion must be one of privilege, and the privilege must not be abused.  Whether the occasion is one of privilege is a question of law . . . .  Whether the privilege was abused . . .  depends upon whether there was malice in fact . . . in uttering and broadcasting the alleged defamatory matter."  *Torosyan*, 234 Conn. at 28 (internal citations and quotations omitted).  A defendant makes statements with malice when he has knowledge that his statements are false or when he makes false statements with reckless disregard for their truth.  *See id.* at 28-29.  In the instant action, Defendants' statements about Plaintiff were not privileged because they were made with malice.

In *Torosyan*, the Connecticut Supreme Court upheld the verdict in favor of the plaintiff and rejected the defendant's privilege defense because evidence supported the trial court's finding that the statements were made "intentionally, . . . with an improper motive, and that [the defendants] failed to investigate or retract the statement even after the plaintiff notified them that the statement was false and requested further review."  *Id.*  The Court also concluded that "the trial court reasonably could have inferred . . . that the defendant's agents published a false statement in order to effectuate the plaintiff's discharge, even though they doubted the statement's veracity."  *Id.* at 29-30.

A reasonable factfinder could reach the same conclusions based on the evidence in the instant action.  A reasonable person could infer that Mr. Van Oudenhove intentionally made false or reckless statements about Plaintiff with an improper motive in order to effectuate her discharge, even though he knew that his statements about Plaintiff lacked factual support.

Defendants have neither demonstrated the absence of disputed issues of material fact nor met their burden of proof that they are entitled to judgment as a matter of law. Accordingly, this Court should deny Defendants' Motion for Summary Judgment as to Count Seven of Plaintiff's Complaint.

### G.    Defendant Van Oudenhove Intentionally Defamed Plaintiff

In order to prove defamation, a plaintiff must demonstrate that "the defendants published false statements that harmed the [plaintiff], and that the defendants were not privileged to do so." *Torosyan*, 234 Conn. at 27. Based on the arguments made in support of Plaintiff's claim that Defendant deprived her of a liberty interest, a reasonable factfinder could also find each element in Plaintiff's Defamation claim. Defendant made false statements about Plaintiff in order to effectuate her discharge and published them in her personnel file. Because said false statements were made intentionally and either with knowledge of their falsity or with reckless disregard for the truth, they are not protected by a qualified privilege. Accordingly, Defendant's Motion for Summary Judgment as to Count Eight of Plaintiff's Complaint should be denied.

### H.    The Individual Defendants in the Instant Action are Not Protected by Qualified Immunity

"When government official abuse their offices, actions for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (internal quotations omitted). Balancing this legal remedy with the necessity of offering government officials some protection, government officials are generally shielded from "civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* However, "[t]he contours of the right must

be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. "Officials receive this protection if they establish that it was objectively reasonable to believe that their acts did not violate clearly established rights." *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993).

Thus, the question becomes whether Defendants reasonably believed that they were permitted under the First Amendment and Fourteenth Amendment to terminate Plaintiff without due process and retaliate against her for having voiced concerns about mishaps and misconduct in the Tax Assessor's office. *See Anderson*, 483 U.S. at 641. As set forth *supra*, each of the rights asserted by the Plaintiff were well settled and the Defendants' conduct was in clear violation of those rights. Resolving all factual disputes and inferences in favor of the Plaintiff, Defendants could not have reasonably believed they were permitted under the law to deprive Plaintiff of her rights under the First Amendment and Fourteenth Amendment.

Even if the court has any reservations about denying Defendants qualified immunity, the issue is properly left to the jury. Although "immunity ordinarily should be decided by the court, that is true only in cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir.1994). As numerous material facts are genuinely in dispute regarding Plaintiff's claims under the First and Fourteenth Amendments, the issue of Defendants' qualified immunity should be left to the jury.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment should be denied in its entirety.

PLAINTIFF,
MARYANNE LEVESQUE

By _____
      Craig T. Dickinson  (CT 18053)
MADSEN, PRESTLEY & PARENTEAU, LLC
44 Capitol Ave. - Suite 201
Hartford, CT  06106
(860) 246-2466
(860) 246-1794
cdickinson@mppjustice.com

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by first class mail on this date to the following counsel of record:

James Sconzo, Esq.
Kevin Brady, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

_____
Craig T. Dickinson